UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JANICE ALFIERI, individually and as
Administratrix of the Estate of
FRANK ALFIERI, Deceased

                    Plaintiff,

      - against -

GUILD TIMES PENSION PLAN,
GUILD TIMES BENEFIT FUND
and ROBERT COSTELLO,

                  Defendants.
------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

CV 03-5717 (ADS)

**A P P E A R A N C E S :**

    **TIERNEY & TIERNEY**
    Attorneys for the Plaintiff
    409 Route 112
    P.O. Box 995
    Port Jefferson Station, New York 11776
    By:    George W. Clarke, Esq.
            of Counsel

    **O'DWYER & BERNSTIEN, LLP**
    Attorneys for the Defendants
    52 Duane Street
    5th Floor
    New York, New York 10007
    By:    Gary Silverman, Esq.,
            of Counsel

**SPATT, District Judge.**

       In this case, the Court must decide whether a spousal consent waiver, signed by

the surviving spouse, but notarized in her absence, is a valid waiver.

       This action arises under the Employment Retirement Income Security Act of 1974

("ERISA") 29 U.S.C. §§ 1101 et seq. The plaintiff Janice Alfieri (the "plaintiff" or "Janice"), as surviving spouse and widow of Frank Alfieri ("Frank" or the "decedent") contends that she never signed and in fact, never saw a document in which she allegedly waived her rights to receive monthly pension benefits as a survivor of Frank.

The complaint consists of two causes of action. In the first cause of action the plaintiff "seeks payment of her rightful share of the Pension as if no election had been made." In the second cause of action, the plaintiff seeks a "written accounting of the proper maximum monthly amounts due her under the said Plan." The defendants in this care are the Guild Times Pension Plan, the Guild Times Benefit Fund and Robert Costello, the Administrator of the Fund.

Factually, this case concerns two issues, namely, (1) did the plaintiff Janice Alfieri sign the "waiver" form and (2) was her signature properly notarized. Depending on the resolution of the two factual issues, the Court must determine the legal consequences.

## I. <u>THE TRIAL</u>

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P.52(a). *See Muller v. First Unum Life Insurance Co.*, 341 F3d 119, 124-125 (2d Cir. 2003); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir. 1991).

Janice Alfieri testified that her husband Frank was born on May 4, 1938 and died on August 23, 2001, at 62 years of age. They were married in 1962 and have lived in Port Jefferson Station for many years. Janice is seven months older than Frank. From age

seventeen, Frank worked for the New York Times at its office at 223 West 43rd Street in Manhattan.  Frank retired on June 30, 2001 and died less than two months later.

While he worked for the New York Times, Frank arose very early and routinely took the 5:40 a.m. Long Island Railroad train from Port Jefferson Station to Manhattan. Janice testified that she never learned to drive.  She stated that the last time she was at the New York Times Building was in 1995; and never after that.

Frank worked for the New York Times from 1955 to June 30, 2001 and had certain pension benefits.  He did not contribute toward these pension benefits.  There came a time in 2001 after 46 years, when Frank decided to retire.  He was tired of traveling back and forth from Port Jefferson by railroad.  He was then 62 years of age. He would have been 63 on December 24, 2001.  Frank did retire on June 30, 2001 and, sadly, died of lung cancer on August 23, 2001.  Janice was his beneficiary under the pension plan.

Apparently, Frank consulted the Plan office a number of times over the two or three years prior to his retirement and obtained various estimates of his pension benefits (see, for example, Dfts. Exs. J and K).  It also appears that Frank resolved to retire effective July 1, 2001, but it was not until on or about June 25, 2001 that he made his formal election for the pension benefits.  A phone message left for the pension officer on June 25, 2001, indicates that Frank elected the "normal" form of benefits, including the one-half cash lump sum (see Plf. Ex. 49).  He returned a number of forms to the pension office including the spousal consent form (Plf. Ex. 9; Dfts. Ex. C); a Designation of

3

Beneficiary form (Dfts. Ex. D); application for Early Retirement Benefits (Dfts. Ex. E); a Surviving Spouse option (Dfts. Ex. F); a Cash Lump Sum option (Dfts. Ex. G); a Direct Rollover form (Dfts. Ex. H) and a withholding certificate (Dfts. Ex. I). Here, there is no question, and the Court finds that Frank made a knowing election to receive the Cash Lump Sum payment coupled with the annuity payment that did not provide a survivor benefit for his wife.

Also, it can be inferred that Frank obtained the pension retirement documents from the pension office on June 25, 2001, the day he telephoned instructions for his pension elections. In addition, the Court notes that the key documents are all dated on June 26, 2001, the date that Janice is alleged to have signed the spousal consent document. In fact, Janice admitted that she signed the "Designated Beneficiary" form (Dfts. Ex. D) on June 26, 2001, and that she knew that the document related to Frank's pension.

Frank died without a will and Janice was appointed as Administratrix of his estate. After Frank retired, and prior to his death, he received three checks from the Newspaper Guild of New York. One check was in the sum of $200,783.17 dated August 15, 2001 and payable to NAMBNA American Bank FBO Frank Alfieri (Plf. Ex. 23B). The second check was also dated August 15, 2001, payable to Frank Alfieri in the sum of $2,360.74 (Plf. Ex. 23C) which covered two monthly payments. The third check was in the sum of $2,475.84 to the order of Frank Alfieri and was also similarly dated (Plf. Ex. 23D). Frank received and accepted all three checks. A fourth check in the sum of $1,237.92 to the

4

order of Frank Alfieri dated September 1, 2001 (Plf. Ex. 24) was received after his death and was returned. No one explained to Janice what the checks were for.

Prior to Frank's retirement no representative of the defendants explained to Janice about any retirement rights for either Frank or her. Prior to sending the last check back, she spoke to a woman at the New York Times, who told her, for the first time, that she had no right to a pension, and to return the last check. At that point Janice retained an attorney. Janice maintains that prior to her husband's death she received no retirement documents of any kind.

After Frank died, Janice found documents which were in his possession and which she never saw before his death. In particular, Janice testified that she never saw and never signed, the crucial document in this case. This document is on the letterhead of the "Newspaper Guild of New York. New York Times" and is entitled "Information to Spouse of Participant on Estimate of Participant's Projected GTP Pension Benefits" (Plf. Ex. 9; Dfts. Ex. C). A photostatic copy of this document is annexed to this decision and marked Appendix A.

This document initially states that "The participant . . . has requested an estimate of GTP retirement benefits. You should know how survivor benefits apply in your case. The figures below are intended to give you, as Surviving Spouse, information about the benefits, if any, you may receive after the Participant's death."

In capital letters, the following words indicate the form of pension benefits Frank elected:

5

#### THE FORM OF PENSION BENEFIT THE PARTICIPANT ELECTS
#### <u>DETERMINES WHAT MAY BE PAYABLE TO YOU FOR LIFE</u>

Following this language, the document sets forth the form of pension payable to the participant and "Payable to you as Surviving Spouse after Participant's Death." Payable to Frank, as the Participant, is a Cash Lump Sum option of $200,983 and pension payments of $1411 per month. In the column indicating Payable to Janice as the Surviving Spouse is a - 0 - both for monthly pension payments and for the Cash Lump Sum option.

Also, there is a column marked "Needs Your Consent" and the words "Yes" indicate that Janice's consent is needed to formalize her consent to Frank's election. This requirement is expressly noted in the following language:

> Based on the Participant's election of retirement benefits, you are required to give written, irrevocable <u>and notarized consent</u> to that election by the Participant. See below. (Emphasis supplied).

The bottom portion of this document, (Plf. Ex. 9; Dfts. Ex. C) reads as follows:

#### SPOUSAL CONSENT – MUST BE NOTARIZED AND RETURNED TO GTP

> In Connection with the retirement of my spouse, Frank Alfieri (SS# redacted), who will effect a normal retirement on July 2, 2001, I understand he has elected the normal form together with the Cash Lump Sum Option.

> I also understand this election eliminates a pension that may otherwise be payable to me as his Surviving Spouse. I acknowledge the effect of his election under the Plan and give my irrevocable consent.

Under the "Spousal Consent" portion of the document, near the bottom, on the right side, is a signature purporting to be that of Janice Alfieri and a handwritten date of

6

6/26/01.  Under the signature is typed the name "Janice Alfiere".  The typed name of

Alfieri is misspelled.   The very bottom portion of the document contains the address of

the New York Times; the telephone numbers of the Benefit Fund and the Pension Plan;

a fax number; and the word "WAIVER" in capital letters.  On the right lower side of the

document is a space for a notary which is signed and stamped by Howard T. Walsh, a

Notary Public.  The notary portion contains only the signature of the notary and a stamp

stating that Howard Walsh is a Notary Public of the State of New York, qualified in

Westchester County, with a commission that expires on September 30, 2002.

Significantly, missing from the document are the usual notarial words, "On this _____

day of _____ 20___, before me personally came _____ to me known to

be the individual described above and who executed the same as his/her free and

voluntary act of the uses and purposes stated herein."

  Janice testified that she never saw the "spousal consent" document until after

Frank died, when she found it in his papers.  She testified unequivocally that she never

met Howard Walsh, the notary public on the document; that on Tuesday June 26, 2001,

the date at issue, she went out to lunch and went shopping at Lake Grove in Suffolk

County; at 3:30 p.m. she went to work at the Port Jefferson Bowling Center; and she did

not go into Manhattan that day.  Further, Janice stated that this signature on the document

was not her handwriting and she never signed this paper.  She stated that, possibly, it was

Frank's handwriting.  However, Janice conceded that "It looks like my signature" (Tr. at

237).[*] Janice admitted that on June 26, 2001 she signed another pension form with regard to her being the designated beneficiary (Dfts. Ex. D). However, she stated that she signed this form at home.

As to the check for $200,983.17, Janice testified that it was received by Frank before he died and it was rolled over into an MBNA Bank IRA account in the names of Janice and Frank, and she still has that money.

Nicole Hanlon, the plaintiff's daughter, testified that Janice did not go to Manhattan during the last week of June 2001. When asked how she knew that fact, Nicole responded that "Because she would have told me that she went." (Tr. at 193). However, she conceded that sometimes her mother did things without telling her. Gregory Alfieri, the plaintiff's son, lived at home with his mother "on occasion." He knows that Janice did not go to Manhattan on June 26, 2001 because he spoke to her on the phone just before she went to lunch with her friend Mrs. Briente. Gregory stated that he has an independent recollection of speaking to his mother on June 26, 2001 because it was his daughter's birthday. He also stated that he spoke to his mother every day - seven days a week for 365 days a year. Also, Gregory testified that he saw his mother in the bowling alley where she worked on June 26, 2001, that very day. Dolores Gulino, a friend of the plaintiff since their high school days, told Janice early in June 2001, "make sure you do not sign away your rights."

On June 26, 2001, the date the so-called "spousal consent" was allegedly signed

---

*Tr. refers to the Trial Transcript.

by Janice, Frank Alfieri signed a document which included an "Option Election" (Dfts. Ex. F). This document contains an acknowledgment by Frank that he received an explanation concerning the "Automatic Surviving Spouse Option"; an explanation of the form of pension benefits available to him; and the surviving spouse option. The document goes on to relate that Frank filed an up-to-date Certification of Marital Status form with the Trustees and that he elected one of the coverages provided. The coverage that Frank Alfieri selected on June 26, 2001 was the "Rejection of Coverage under the Surviving Spouse Option on any basis" and the election of the "Cash Lump Sum Option." The following is the option selected by Frank by checkmarks on the paper:

### OPTION ELECTION*

I have filed an up-to-date Certificate of Marital Status form with the Trustees and I am eligible for pension benefit payment and/or option coverage under the Plan. I understand this option election may not be elected, cancelled or modified after the Benefit Commencement date and hereby elect one of the following:

☐  Coverage under the Surviving Spouse Option on a ____% basis (50% or 75% or 100%).

☐  Coverage under the Surviving Spouse Option on a _____% basis (50% or 75% or 100%) together with coverage under the Cash Lump Sum Option. Attached is my completed form on which I elect such option.

☒  Rejection of coverage under the Surviving Spouse Option on any basis, whether or not I am married. Notwithstanding this rejection of the Surviving Spouse Option on any basis, I have other option rights under the Plan. Accordingly, I hereby elect one of the following:

    ☒  Coverage under another applicable option as indicated below. Attached is my completed form on which I elect such option.

    ☐  I do not wish to elect an option.

It is therefore clear that, on June 26, 2001 -- the same date that Janice is alleged to have signed the "spousal consent" at issue – Frank expressly rejected coverage for her under the surviving spouse option, and, instead, elected to receive a $200,000 lump sum payment and increased monthly monetary benefits. This action on Frank's part was compatible with the object of the signed "spousal consent" form at issue.

Howard Walsh was the notary public who notarized the signature on the disputed "spousal consent" document. He has been an employee of the New York Times for almost 40 years. Walsh knew the decedent and worked with him for a number of years. Frank and Walsh worked on the same floor and in the same Customer Fulfillment Department for about six years. They did not socialize and all their contacts were on the sixth floor at 229 West 43rd Street.

In the year 2001, Walsh was a notary public and had been one for at least twenty years. The Times asked him to be a notary because he handled delinquent accounts and needed to notarize documents in connection with that assignment. He then took the required test and became a notary public. Walsh resided in Yonkers, New York and qualified as a notary in Westchester County.

When Walsh notarizes documents for a person he has never met before, his usual procedure is to swear in the person and then have him or her sign before him. He does not ask for identification and generally reads the oath to the person whose signature he notarizes.

With regard to this particular notarization, Walsh was shown the "spousal

consent" document at issue (Plf. Ex. 9; Dfts. Ex. C). He testified that he doesn't remember previously seeing it. Walsh readily acknowledged that the document contained his signature and his notarial stamp, but he doesn't remember signing it. However, he stated that notwithstanding his qualification as a notary in Westchester County, he notarized documents only on the sixth floor of the New York Times Building in Manhattan. He testified that he notarized this document on the sixth floor of the New York Times Building.

Amplifying his answer as to his notarization of this document, Walsh testified that as a notary he signed a lot of papers for the New York Times including many buy-out and early retirement documents, as he was the only notary on the sixth floor. Walsh further testified that he recognized the form of document at issue and that he notarized some of the same forms. In addition, he recalls Frank Alfieri coming to him and asking him if he would notarize a document. However, he does not recall meeting Janice Alfieri.

Q    Do you remember signing this document? Exhibit C?

A    No.

Q    Do you know who was present in front of you at the time you signed that document?

A    I do not remember who was there. I know who would have to be there but I don't remember. I don't remember the incident at all.

.    .    .

Q    So if you see your signature on the bottom of this Exhibit C, is it fair to say you notarized that on the sixth floor of the New York Times building in Manhattan?

A       Yes.

                         .   .   .

Q       Okay.  Do you recall Frank Alfieri coming to you and asking you to notarize a document for him?

A       I recall Frank coming to me and asking me if I would.

Q       Okay.  Can you describe Janice Alfieri?

A       No.

Q       Do you recall meeting her?

A       No.

Q       Do you recall asking for identification of a woman to see if she was Janice Alfieri?

A       No.

Q       Okay.  Do you recall Frank coming up to you and introducing his wife to you on the sixth floor?

A       No, I don't.

Tr. at 95, 98.

Walsh readily recognized his signature and his insertion of the date on the document.  Walsh stated that the date next to the handwritten words "Janice Alfieri" was placed there by him, as was his notarial stamp.  Walsh testified that he would not have notarized a document without the party being there before him.  His practice was that the person whose signature was being notarized had to be present before him.

Q       In responsible [sic] to a question from Mr. Clarke as to whether or not you remember who was present at the time your notary was affixed to this document, you stated you don't recall who was there but you said you

know who had to be there.

Do you recall saying that, sir?

A    Yes, I do.

Q    What do you mean by you know?

You recall or you know who had to be there?

What do you mean by that, sir?

A    Because I would not have notarized a document without the relevant party or parties there.

Q    And did you have a practice in or about June of 2001, June 26, 2001, as to whether or not the person whose signature you were notarizing had to be present when you affixed your notary stamp and seal?

A    Yes.

Q    What was that?

A    They had to be there.

Q    Is there any question in your mind as to the practice you had on June 26, 2001, as to the person whose signature you were notarizing had to be present before you?

.    .    .    .    .

A    The person would have had to have been present.

Tr. at 109-110.

Robert A. Costello is the Administrator of the Newspaper Guild and Pension Fund ("the Guild") since 1987 and is a defendant in this case. He reports to the Guild Board of Trustees who make policy. Costello administers this policy. Ultimate decisions affecting the Guild are made by the Board of Trustees. Costello reviewed the various

benefit plans available to retirees. It was the practice of the Guild to mail statements of accrued and projected benefits to all participants on a yearly basis.

Costello explained the plaintiff's estimated pension benefits (see Dfts. Ex. K). If there was no cash lump sum and no surviving spouse benefit to Janice, Frank would receive the sum of $2,822.50 per month for life. If he designated Janice for surviving spouse payments, his monthly payments would be reduced to $2,258.00 per month, depending on the type of plan. That would be a reduction of almost $600 per month if he included Janice for survivorship benefits. However, Frank elected to receive the cash lump sum option of $200,983.17 and no survivorship to Janice. In that event, all of his monthly payments were reduced by one-half, to the sum of $1,411 per month.

Also, Costello testified that, in order for a married participant to receive a lump sum payment, the spouse would have to be notified of the diminished spousal payments. He stated that no lump sum payment would be made without the spouse signing the spousal consent form, which is the disputed document in this case (Plf. Ex. 9; Dfts. Ex. C). Costello testified that he spoke to Frank about his pension rights on a number of occasions and met with him in April, May and June 2001. He also prepared pension statements for Frank.

There was only one witness in the defendants' case, Gus R. Lesnevich, a forensic document examiner, better known as a handwriting expert. Lesnevich had extensive experience as a forensic document examiner for ten years in the U.S. Army Criminal Investigation Laboratory, and as Chief of the Questioned Document Unit in Viet Nam,

eight years with the Secret Service, and as a consultant for other government agencies.

Lesnevich analyzed the disputed signature of Janice Alfieri on the spousal consent form by comparing the "questioned" signature with several "known signatures" (Dfts. Exs. O, P, U and AA). After comparing all of these writings, Lesnevich testified that the disputed Janice Alfieri signature on Defendants' Exhibit C, the so-called "consent" document, and the known signatures were the product of one writer. Lesnevich prepared a comparison chart with the enlarged known signatures and the disputed signature (Dfts. Ex. Z). He then demonstrated in detail the similarity between the known signatures and the disputed signature. In so doing, he stated the signature at issue was a natural and fluid writing. In his opinion, the same person wrote the signature on the "consent" form and the known signatures. He further described the signature at issue as spontaneous, natural, free-flowing and unique in the formation of letters.

On cross-examination, Lesnevich testified that he was only asked to examine the signature at issue. He has no idea when the signature was placed on the "spousal consent" document; when the date was inserted; or when the notary signature and seal was placed on the document.

## II.  FINDINGS OF FACT

As a finding of fact, the Court finds that Janice Alfieri did sign the "spousal consent" form. The Court credits the unrefuted testimony of Gus Lesnevich, the forensic document examiner, that the same writer signed the signature at issue as the writer of the known signatures. In addition, the Court notes that Janice, herself, testified that "It looks

like my signature."

Also, as a finding of fact, the Court finds that Janice Alfieri did not travel into Manhattan from Port Jefferson Station on June 26, 2001. The Court further finds that Janice Alfieri signed the "spousal consent" form at home, at the request of her husband, probably on June 25, 2001, the day or night before the document was notarized. With reasonable certainty, she signed the "spousal consent" at home, at the same time she signed the designated beneficiary document (Dfts. Ex. D).

The Court credits the testimony of Janice Alfieri that she did not travel into Manhattan on June 26, 2001, solely for the purpose of having her signature notarized. The Court notes that, as a practical matter, this document could have been signed by Janice in Port Jefferson before a notary public in a bank or lawyer's office or real estate office in that area. Rather than go to that trouble, Frank had Janice sign the "spousal consent" at home in Port Jefferson Station and he brought it into Manhattan with him. Walsh testified that Frank came to him and asked him to notarize a document. Significantly, Walsh does not remember seeing Janice. He recalls Frank approaching and asking him to notarize a document, but he does not recall Frank introducing him to Janice or even meeting Janice.

Here, the most likely scenario is that of a friend coming to the notary and asking him to do him a favor and notarize a document in the absence of the signatory. This finding is supported by the absence of any acknowledgment by the notary that the person before the notary was known to be the individual who signed the consent. The Court also

notes that the typewritten name below the signature is misspelled.

Having determined those key factual issues, namely, (1) that Janice Alfieri, herself, signed the waiver document, (2) that Janice did not sign the waiver document in front of the notary, and (3) that the notary signed the document in the absence of Janice, does not resolve this case. There is still to be determined the issue of the validity of the "spousal consent."

## III. DISCUSSION

### A. The ERISA Law as to a Surviving Spouse

The Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. § 1001–1461, is a comprehensive statute governing pension and welfare plans for the nation's work force. ERISA is designed to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years. *See Boggs v. Boggs,* 520 U.S. 833, 839, 117 S. Ct. 1754, 1760, 138 L.Ed.2d 45 (1997). The principal object of the statute is to protect plan participants and beneficiaries. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S. Ct. 2890, 2896, 77 L.Ed.2d 490 (1983).

In furtherance of this principle, ERISA requires that every qualified joint and survivor annuity plan include an annuity payable to a nonparticipant surviving spouse that is not less than 50% of the amount of the annuity that is payable during the joint lives of the participant and spouse. 29 U.S.C. § 1055(d)(1). This benefit may only be waived by the surviving spouse by complying with the strict requirements established by ERISA.

*Lombardo v. United Techs. Corp.*, No. 95-2353, 1997 U.S. Dist. LEXIS 7651, at *14-15

(D. Conn. May 7, 1997) (stating that ERISA's strict requirements insure that the spouse

consents to an act that may divest him or her of the right to receive future benefits).

> Under ERISA, an effective waiver of a spouse's rights to benefits requires that:
>
> 1. The spouse of the participant consents in writing to such an election;
>
> 2. The election designates a beneficiary (or a form of benefit) that may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse);
>
> 3. The spouse's consent acknowledges the effect of the election; and
>
> 4. <u>The consent is witnessed by a plan representative or notary public</u>.

29 U.S.C. § 1055(c)(2) (emphasis added); *Neidich v. Estate of Neidich*, 222 F. Supp. 2d

357, 366 (S.D.N.Y. 2002). The statutory object of Section 1055's provision is to "ensure

a stream of income to surviving spouse." *Boggs v. Boggs*, 520 U.S. at 1175; *see also*

*Federal Express Corp. v. Walker*, 335 F. Supp. 875 (W.D. Tenn. 2004). The necessity for

strict construction of an alleged "spousal waiver" was explained in *Hagwood v. Newton*,

282 F.3d 285 (4th Cir. 2002), as follows:

> The spousal rights conferred by § 1055(a) were intended to "ensure a stream of income to surviving spouses," *Boggs*, 520 U.S. at 843, 117 S.Ct. 1754, and the formalities required in § 1055(c) are included <u>to protect against the risks of a spouse's unwitting waiver of those rights</u>, *Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir. 1997) (noting that formalities are necessary "to ensure a valid waiver of a spouse's retirement plan [and] are consistent with the legislative policy of protecting spousal rights"). ERISA's formalities must, therefore, be strictly enforced. In *Lasche*, for example, the court held that a waiver was invalid under § 1055 simply because the signatures had not bee witnessed by a notary as required by that section.

18

*Hagwood*, 282 F.3d at 290 (emphasis added); *see also Sun Microsystems, Inc. v. Lema*, No. C04-04968JF, 2006 WL 278386 (N.D. Cal. Feb. 2, 2006) ("The 1989 designation also is likely invalid on the ground that Seaoria's signature, waiving her spousal benefits, was not witnessed by a Plan representative or notary public.").

"Under ERISA, waiver of the qualified joint and survivor annuity, the standard form of payment from a defined benefit plan to a participant before death, is invalid unless it satisfies the rigorous rules in § 1055(c)." *Rice v. Rochester Laborers' Annuity Fund*, 888 F. Supp. 494, 498 (W.D.N.Y. 1995) (quoting *Lester v. Reagan Equip. Co. Profit Sharing Plan & Empl. Savings Plan*, No. 91–2946, 1992 WL 211611, at *5 (E.D. La. Aug. 19, 1992)). Accordingly, the waiver requirements listed in the ERISA statute call for strict compliance. *Neidich*, 222 F. Supp.2d at 366; *see also, McMillan v. Parrott*, 913 F.2d 310 (6th Cir. 1990).

In keeping with the strict requirements, the Eleventh Circuit held that a waiver that is not "witnessed by a plan representative or notary public," will fail as a matter of law. *See Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 866 (11th Cir. 1997). In *Lasche*, the Eleventh Circuit affirmed the district court in finding that a waiver was invalid, despite admittedly being signed by the participant's spouse. In that case the space provided for the notary to sign was left blank. The court held that the statutory language of ERISA unambiguously required a plan representative or public notary to actually witness the spouse's signature on the waiver. *Id.*

Outside of the context of ERISA, other courts have encountered flaws in

notarization requirements and found them to be "technical" in nature and insufficient to defeat the validity of the signed document. *See Lombardo v. United Techs. Corp.*, No. 3:95CV02353 (WWE), 1997 U.S. Dist. LEXIS 7651, at *9-10 (D. Conn. 1997) (a defect in the expiration date of the notary); *In re Estate of Sbarra*, 17 A.D.3d 975, 976, 794 N.Y.S.2d 479, 480 (3d Dep't 2005) (a separation agreement is enforceable despite the alleged insufficiency of the acknowledgment); *see also Projects Unlimited, Inc. v. Copper State Thrift & Loan Co.*, 798 P.2d 738 (Utah 1990) (a mechanic's lien notice was not invalid, even though notary failed to include her address and commission expiration date in the jurat). However, these cases did not involve the ERISA strict requirements leading to the loss of benefits by a surviving spouse.

In 1994, one court has contemplated relaxing ERISA's strict notarization requirement for surviving spouse waivers. In *Butler v. Encyclopedia Brittanica, Inc.*, 41 F.3d 285, 293 (7th Cir. 1994), the decedent's surviving spouse admittedly had executed and signed a waiver, and a notary public signature and certificate of acknowledgment and stamp appears on the document. However, the spouse contended that his signature was nevertheless invalid because it was not signed in the physical presence of a notary. The court disagreed, reasoning that strict compliance with the notary requirement was not absolutely necessary.

The defendants' main contention relies on *Butler*, arguing, "Either way, by admission or by Court finding, signature in front of a notary is a technicality and the signing party should not be relieved of the effect of his or her signature." Dfts. Post Tr.

Mem. at 15-16. Counsel for the defendants goes further and states "The teaching of *Butler* is that if the spouse signed the consent, the notarization fails to be a significant issue. Thus, a finding that Mrs. Alfieri signed the document, without more, is sufficient to uphold the validity and give it effect as a waiver of the surviving spouse option." The Court disagrees with the defendants' substantial compliance argument.

The 1994 *Butler* decision did not resolve this strict compliance issue. The decision in *Butler* really revolved around the notary public certificate of acknowledgment, which was on the document at issue, as follows:

> We need not resolve this issue, however, because even if we were to apply a strict construction of the witnessing requirement, we find that Cotini lacks sufficient evidence to prove that the consent form he signed was not properly witnessed.
>
> A notary public's certificate of acknowledgment, regular on its face, carries a strong presumption of validity. 1 Am.Jur.2d *Acknowledgments* § 83 (1994) ("If a certificate of acknowledgment is complete and regular on its face, the facts stated in the certificate are presumed to be true[;] . . . it is also presumed . . . that the legal duties incumbent upon the officer in doing so have been properly performed."). Accordingly, the courts have held that in order to overcome this presumption, clear and convincing evidence is required. *See, e.g., id.* § 84; *Witt v. Panek*, 408 Ill. 328, 333, 97 N.E.2d 283, 285 (1951) ("the rule is that the record of conveyance and the certificate of acknowledgment can be overcome only by proof which is clear, convincing and satisfactory, and by disinterested witnesses.").
>
> The notary's certificate in this case unambiguously states that Anthony Cotini appeared personally before the notary on August 27, 1990, and executed the spousal consent form. Cotini's evidence attacking the certificate falls far short of the clear and convincing standard."

*Id.* at 294-295.

In 1997, in *Lasche*, the Eleventh Circuit expressly criticized the "substantial

21

compliance theory" espoused in Butler and declined to adopt it. The Eleventh Circuit held that such a theory was "a precedential path [they] refused to travel . . . ," and one that "would contravene the explicit waiver requirements of ERISA that Congress had enacted." *Lasche*, 111 F.3d at 866.

In addition, the Court notes that in *Butler* the Seventh Circuit never explicitly adopted the "substantial compliance theory." Stopping short of disregarding the strict waiver requirements in the text of ERISA, the Seventh Circuit found that the surviving spouse lacked sufficient evidence to rebut the "strong presumption" raised by notary public's certificate of acknowledgment. *Id.* at 294. Instead, the Court noted that the notary's certificate on the document unambiguously stated that the spouse had appeared personally and executed the spousal consent waiver form. Despite the vulnerability of the authenticity of the notary's certificate, the Seventh Circuit held that "[a] notary public's certificate of acknowledgment, regular on its face, carries a strong presumption of validity." *Id.* at 285 (citing 1 Am.Jur.2d Acknowledgments § 83 (1994) ("If a certificate of acknowledgment is complete and regular on its face, the facts stated in the certificate are presumed to be true[;] ... it is also presumed ... that the legal duties incumbent upon the officer in doing so have been properly performed.")).

This approach is sensible. The purpose of a notary is to certify and acknowledge that a signatory who appears before a notary is who she purports to be and attest that such person actually signs the document. *See Olmeca, S.A. v. Manufacturers Hanover Trust Co.*, 639 F. Supp. 1142, 1147 (S.D.N.Y. 1986). The notary must be reasonably sure of the

identity. This authentication is entitled to a strong presumption. "[A] certificate of acknowledgment should not be overthrown upon evidence of a doubtful character, such as the unsupported testimony of interested witnesses, nor upon a bare preponderance of evidence, but only on proof so clear and convincing as to amount to a moral certainty." *Osborne v. Zornberg*, 16 A.D.3d 643, 644, 792 N.Y.S.2d 183, 184 (2d Dep't 2005) (quoting *Albany County Sav. Bank v. McCarty*, 149 N.Y. 71, 80, 43 N.E. 427 (1896)); *accord 39 College Point Corp. v. Transpac Capital Corp.*, 22 A.D.3d 663, 802 N.Y.S.2d 733, 734 (2d Dep't 2005).

However, in this case, unlike *Butler*, there is no notary public certificate of acknowledgment and, therefore, no strong presumption of validity. Also, there is no presumption that the facts that would have been stated in the certificate are true. Nor is there a presumption that the legal duties incumbent upon the notary public have been properly preformed.

The cases are replete, in all fields of the law, as to the necessity of an acknowledgment in the notarization of certain important documents that either have to be filed or recorded or dispose of valuable rights. *See Matisoff v. Dobi*, 90 N.Y.2d 127, 681 N.E.2d 376, 659 N.Y.S.2d 209 (1987) (holding that an unacknowledged postnuptial agreement was unenforceable); *Garguilio v. Garguilio*, 122 A.D.2d 105, 504 N.Y.S.2d 502 (2d Dep't 1986) (holding that a separation agreement without an acknowledgment was invalid); *Troyer v. Mundy*, 60 F.2d 818 (8th Cir. 1932) (holding that a mortgage without a proper acknowledgment was fatally defective).

Authoritative texts agree with this principle.  See 1 N.Y.Jur.2d Acknowledgments § 13 ("[S]trict compliance with requirement is necessary for a valid acknowledgment."); 2 Carmody-Wait 2d § 5:15 ("[S]trict compliance . . . is necessary for a valid acknowledgment.").

The Court finds that Janice Alfieri has sustained her burden to prove, by clear and convincing evidence, that Walsh, the notary public, did not properly notarize her signature in her presence.  Janice signed the "spousal consent" in Port Jefferson Station; Frank took the document to the New York Times office in Manhattan; Frank asked Notary Walsh to do him a favor and notarize the document without the presence of his wife; and Walsh accommodated him.  The statute mandates that the consent must be "witnessed by a plan representative or notary public."  Here the consent was witnessed by neither.  Therefore, the Court finds that (1) Janice Alfieri signed the waiver of her surviving spouse rights, (2) the notary signature and stamp was affixed to the waiver document in her absence, (3) that there was no "acknowledgment" in the notarization; (4) the notarization was not valid or properly performed, and (5) Janice's signature was not witnessed by a plan representative or notary public.

Accordingly, in the absence of compliance with the strict ERISA statutory requirements for this very important document, the Court finds that the "spousal consent" was not valid, and that Janice never legally consented to the waiver of her survivor rights.

**B.**     **As to the Plaintiff's Other Contentions**

**1.**     **The claim that notary public Walsh is interested in the event so as to disqualify him as a notary public.**

In this regard, the plaintiff alleges that Howard Walsh, as a co-employee of Frank Alfieri is "himself a participant in the Times Pension Plan . . as such he is ineligible to serve as a notary for the election document in question."  (Plf.  Post Trial Mem. of Law at 23).

The Pension Plan at issue is a defined benefit plan in that the pension benefits payable to participants are derived solely from employer contributions.  The benefits are calculated on earnings and length of service.  (See Dfts. Ex. B, pp. 6, 8).  In this type of pension plan, each participant's benefits are determined separately and have no relation to another participant's benefits.  Stated simply, the benefits are determined by each participant's earning history.  Thus, Walsh's benefits are not affected by the sums paid to or on behalf of Frank.

In the cases cited by the plaintiff in her memorandum of law, the notaries had an interest in the transaction, that is not present here.  For example, in *Armstrong v. Combs*, 15 A.D. 246, 248, 44 N.Y.S. 171 (3d Dep't 1897), the deed was notarized by a party to the real estate transaction.  In *People Rel Erie R Co. V. Board of RR Commissioners*, 105 A.D. 273, 93 N.Y.S. 584, 587-88 (3d Dep't 1905), the certificate of incorporation at issue was notarized by one of the incorporators.  Also, in *Sumkin-Hammonds*, 177 Misc.2d 1006, 1009, 677 N.Y.S. 734 (Dist. Ct. Nassau Co. 1998), the landlord himself notarized an

affidavit of service, which rendered it null and void because he had a "direct and pecuniary interest" in the case.

In this case, the Court finds that notary Walsh had no personal or financial interest in Frank's pension. Any "indirect" interest alleged by the plaintiff would not constitute a ground for invalidating Walsh's notarization. Here, there is no self-interest or pecuniary interest on the part of Walsh as a result of him being a participant or a Union representative in the Times Pension Plan. There is no basis to believe that Walsh's future interests will be affected in any way by Frank's pension plan or by this litigation. Such a possible interest on the part of Walsh is far-fetched and totally speculative.

    2.    The Plaintiff's Spoliation Claim

The plaintiff accuses the defendant of "an unaccountable act of evidence spoliation" (Plf. Post Trial Mem. at 12). This involved the alleged "dispositive times sign-in book for June 26, 2001," which, according to the plaintiff, would have resolved whether Janice visited her husband in Manhattan on that day, and was destroyed. In this regard, the plaintiff refers to the Security Log Book for 229 West 43rd Street in Manhattan. The New York Times Company responded to a subpoena by plaintiff's counsel, in a letter dated November 7, 2005, (Plf. Ex. 50) which reads, in part, as follows:

> The Security Log Book for 229 West 43rd Street for June 26, 2001 was destroyed in the normal course of business. We do not know the specific date the book was destroyed. We have no retention policy for this material.

In support of this spoliation contention, the plaintiff cites two cases. The first

*United States v. Zeidman*, 540 F.2d 314 (7th Cir. 1976) is a criminal case with absolutely

no relevance to this case. The second decision, *Abrams v. Shentsman*, 173 A.D.2d 420, 570 N.Y.S. 48 (1st Dep't 1991) which concerns the fiduciary obligation of general partners to limited partners is also irrelevant to the issues in this case.

A party seeking an adverse inference or similar advantage based on the destruction of evidence must establish that the party having control over the evidence had an obligation to preserve it at the time it was destroyed. *Residential Funding Corp. V. DeGeorge Financial*, 306 F.3d 99, 107 (2d Cir. 2002); *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001). In this case, the Security Log Book was a record maintained and controlled by the New York Times, a separate entity from the defendant Pension Plan. Accordingly, the plaintiff's spoliation contention is without merit.

## IV. <u>OUTSTANDING ISSUES TO BE DETERMINED</u>

Although the Court has determined that the "spousal consent" signed by Janice is not valid or effective to nullify her rights as a surviving spouse, there are a number of issues still to be decided by the Court. These issues are as follows:

(1)     What are the remedies to be afforded to Janice as a result of the Court's determination in this opinion? Stated succinctly, what happens from now on with regard to the benefits to Janice? Does she retain the $200,000 lump sum and the two monthly payments that were already paid? What amounts will be paid to her in the future?

(2)     Are the defendants entitled to "safe haven" benefits? (*See* 29 U.S.C. § 1055 (c)(6); *Vilas v. Lyons*, 702 F. Supp. 555, 559 (D. Md. 1988). In particular, did the Plan Administrator rely on a "spousal consent" waiver that was valid on its face and had no

actual knowledge of its invalidity?  If so, it is discharged "from liability to the extent of payments made pursuant to such act."  29 U.S.C. § 1055(c)(6).  *See Lombardo v. United Technologies Corp.*, No. 3:95 CV02353 (WWE), 1987 WL 289669 (D. Conn. May 7, 1997).

        (3)      Is plaintiff's counsel entitled to attorney's fees and costs?

        These issues will be resolved in a hearing to be held before the Court on September 5, 2006 at 3:30 p.m.  In the interim, counsel for both sides are directed to send a letter to the Court on or before August 18, 2006 with your views on these three outstanding issues.

## V.  <u>CONCLUSIONS</u>

        The Court finds that there was no valid "spousal consent" by the surviving spouse Janice Alfieri.

        The parties are directed to appear before the Court on September 5, 2006 at 3:30 p.m. to determine the outstanding issues.

**SO ORDERED.**

Dated: Central Islip, New York
       August 3, 2006

                                       */s/ Arthur D. Spatt*
                                   ARTHUR D. SPATT
                       Senior United States District Judge